UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ROSE CHASE,

|  | |  |
|---|---|---|
| | Petitioner, | REPORT |
| | | and |
| v. | | RECOMMENDATION |
| SUPERINTENDENT LaMANNA, | | 19-CV-00617V(F) |
| | Respondent. | |

_____

APPEARANCES:    ROSE CHASE, *Pro Se*
                14-G-0057
                Bedford Hills Correctional Facility
                247 Harris Road
                Bedford Hills, New York  10507-2400

                LETITIA A. JAMES
                ATTORNEY GENERAL of the STATE of NEW YORK
                Attorney for Respondent
                LISA E. FLEISCHMANN,
                ALYSON GILL,
                ARLENE ROCES, and
                LAURA LAMPERT
                Assistant Attorneys General, of Counsel
                120 Broadway
                New York, New York  10271

## **JURISDICTION**

Petitioner commenced this proceeding on May 13, 2019, requesting habeas relief pursuant to 28 U.S.C. § 2254.  On February 22, 2020, Honorable Lawrence J. Vilardo referred the matter to the undersigned pursuant to 28 U.S.C. § 636(b)(1) for all pre-trial matters.

## BACKGROUND

Petitioner Rose Chase ("Petitioner" or "Chase"), proceeding *pro se*, filed a petition (Dkt. 1), seeking habeas relief challenging her January 15, 2014, conviction by jury in New York Supreme Court, Ontario County ("County Court"), on multiple charges pertaining to Petitioner's June 14, 2012 murder of her husband Adam Chase ("Adam" or "the Deceased"), following which Petitioner concealed the body in the basement of the marital home for several weeks before transporting Adam's decomposing remains in a vehicle, in which Petitioner's four-year old child also rode, to the home of Petitioner's mother where Petitioner burned Adam's remains.  On January 31, 2013, Petitioner was indicted in County Court on charges of murder in the second degree in violation of New York Penal Law ("N.Y. Penal Law") § 125.25[1], tampering with physical evidence in violation of N.Y. Penal Law § 215.40[2], and endangering the welfare of a child in violation of N.Y. Penal Law § 260.10[1].  Ontario County District Attorney R. Michael Tantillo ("Tantillo"), and Assistant District Attorney Heather A. Hines ("Hines"), prosecuted the case.  Throughout the criminal proceedings, Petitioner was represented by Ontario County Public Defender Leanne Lapp ("Lapp") and Assistant Public Defender Catherine A. Walsh ("Walsh").

On July 11, 2013, a hearing commenced in County Court before Ontario County Judge William F. Kocher ("Judge Kocher"), pursuant to *People v. Huntley,* 204 N.E.2d 179 (N.Y. 1965) ("*Huntley* hearing"), to determine whether Petitioner's pre-arrest inculpatory statements, which were admitted against Petitioner at trial, were voluntarily made and complied with Petitioner's right to the warnings required by *Miranda v. Arizona,* 384 U.S. 436 (1966) ("*Miranda*").  The *Huntley* hearing concluded on July 24,

2013, when Judge Kocher found the statements were voluntarily made and did not violate *Miranda*.  A jury trial commenced on October 7, 2013, in Ontario County Court before Judge Kocher, and concluded October 18, 2013.  In addition to the charges for tampering with physical evidence, endangering the welfare of a child, and murder in the second degree, the jury was also instructed, at Chase's request, as to the lesser included offenses of manslaughter in the second and first degree in violation, respectively, of N.Y. Penal Law §§ 125.15 and 125.20.  State Court Record (Dkt. 13-2) at 13; 158-59; Trial Transcript (Dkt. 13-5) at 1807-09; 1829-31.[1]  After deliberating, the jury returned a verdict on October 18, 2013, finding Petitioner guilty of tampering with physical evidence, endangering the welfare of a child, and murder in the second degree.  On January 15, 2014, Petitioner was sentenced to an aggregate, indeterminate sentence of 24 1/3 years to life.  On appeal, Petitioner's conviction on the murder and evidence tampering charges were affirmed, but the charge of endangering the welfare of a child was dismissed.  *People v. Chase*, 71 N.Y.S.3d 293 (4th Dept. 2018).  On May 8, 2018, leave to appeal to the Court of Appeals was denied.  *People v. Chase*, 103 N.E.3d 1248 (N.Y. 2011) (Table).

On May 13, 2019, Petitioner filed her petition pursuant to 28 U.S.C. § 2254 (Dkt. 1) ("Petition"), asserting nine grounds for habeas relief including (1) the Appellate Division erred in determining the evidence for Petitioner's second degree murder was legally sufficient such that the verdict was not against the weight of the evidence; (2) the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady*"), by discarding the

---

[1] In a pretrial omnibus motion filed April 22, 2013, Petitioner requested the Indictment be reduced by including alternative charges of the lesser included offences of manslaughter in the first and second degree.  State Court Record at 158-59.  Although the court is unable to determine when Judge Kocher ruled on this request, the jury was instructed on the lesser included offenses.  Trial Tr. at 1807-09.

trash can that had held some of the Deceased's burned remains, and *People v. Rosario*, 173 N.E.2d 881, *cert. denied*, 368 U.S. 866 (1961) ("*Rosario*"), by not disclosing a text message; (3) admission of certain evidence violated petitioner's confrontation rights; (4) the court erred in dismissing a sworn juror; (5) petitioner's statement to investigators was taken unknowingly, involuntarily, and unintelligently; (6) a prospective juror's remark tainted the entire panel; (7) another juror made a prejudicial remark during summation; (8) her trial counsel was ineffective with respect to one juror-related claim; and (9) the prosecutor made inflammatory and prejudicial remarks during summation.  Petition ¶ 22 & Attachment.  Also on May 13, 2019, Petitioner filed the first of three motions requesting the court stay consideration of the Petition and hold the Petition in abeyance pending Petitioner's exhaustion of unidentified habeas grounds in the Petition.  Dkt. 4 ("First Motion to Stay").  On May 28, 2019, Petitioner filed a second request for a "stay and abeyance," Dkt. 5 ("Second Motion to Stay"), asserting a stay was necessary to allow Petitioner to pursue a motion in state court pursuant to N.Y. Crim. Proc. Law § 440 ("§ 440 motion").  Second Motion to Stay at 2.  In neither her First nor Second Motion to Stay did Petitioner specify which of her habeas grounds are unexhausted, but maintained her lack of knowledge of the need to exhaust the grounds in state court, including through a § 440 motion, constituted "good cause" for the requested stay and abeyance.  *Id.*

On February 18, 2020, Respondent filed an answer (Dkt. 13), attaching the Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus (Dkt. 13-1) ("Respondent's Memorandum"), the State Court Record (Dkt. 13-2), the *Huntley* hearing

transcripts (Dkts. 13-3 and 13-4), the trial transcript (Dkt. 13-5),[2] and a transcript of

Petitioner's video-taped interview by investigators on December 13, 2012 (Dkt. 13-6).

In a Decision and Order filed August 9, 2021 (Dkt. 16) ("August 9, 2021 D&O"),

the undersigned denied both the First and Second Motions to Stay without prejudice,

explaining, as relevant here, that Petitioner did not indicate which of her nine grounds

for habeas relief she intended to exhaust.  August 9, 2021 D&O at 5-6.  On September

20, 2021, Petitioner filed a third motion for a stay and abeyance (Dkt. 17) ("Third Motion

to Stay"), again failing to identify which of her grounds were unexhausted.  In a Decision

and Order filed September 1, 2020 (Dkt. 23) ("September 1, 2020 D&O), the

undersigned determined only two of Petitioner's grounds for habeas relief were

exhausted including the first ground asserting the evidence of second degree murder

was legally insufficient and the verdict was against the weight of the evidence ("First

Ground" or "sufficiency of the evidence ground"), and the second ground asserting, *inter

alia*, that the prosecutor violated *People v. Rosario*, 173 N.E.2d 881, *cert. denied*, 368

U.S. 866 (1961) ("*Rosario*"), by not disclosing a text message ("Second Ground" or

"*Rosario* ground").[3]  September 1, 2020 D&O at 6-7.  The undersigned denied the Third

Motion to Stay and directed Petitioner to advise the court whether Petitioner preferred to

withdraw the unexhausted grounds and proceed with the exhausted grounds, or

withdraw the Petition in its entirety and be barred by the statute of limitations from

seeking further habeas relief.  *Id*. at 11.  By letter to the undersigned dated September

---

[2] The court notes that the Trial Transcript is missing pages 694-97.  *See* Dkt. 13-5 at 693-94.

[3] Petitioner's Second Ground also asserted the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady* violation"), by discarding the trash can that had held some of the Deceased's burned remains, but the undersigned determined the *Brady* violation was unexhausted.  September 1, 2022 D&O at 10 n. 5.

15, 2022 (Dkt. 24), Petitioner advised she was withdrawing her unexhausted grounds and requested to proceed with her habeas petition on the exhausted grounds.

Based on the following, the remaining grounds are without merit and the Petition should be DISMISSED.

## **FACTS**[4]

Petitioner married Adam in 2001, and Petitioner gave birth to her son T.C. ("T.C.")[5] on September 9, 2007.  Trial Tr.[6] at 556-57.  At all times relevant to this action, Petitioner and Adam resided in a two-story house on Mott Road in the hamlet of Stanley in the Town of Seneca in Ontario County, New York, about five minutes from the home of Adam's parents, Silvia Chase ("Silvia") and Lindon Chase ("Lindon").  It is undisputed that Petitioner had several affairs during the marriage, Interview Tr.[7] at 20-21, and began dating one Mark Broadhurst ("Broadhurst"), in April 2012.  Trial Tr. at 866-67.  On June 11, 2012, Chase family friend Rebecca Grube ("Grube") observed Petitioner and Broadhurst kissing in a local park, and used her cellphone to take a picture of the two kissing, then texted the picture to Adam's sister Jessica Chase ("Jessica"), who showed the picture to her mother, Silvia Chase.  *Id*. at 560-61, 593-94.  On June 12, 2012, Petitioner went to pick up T.C. at Silvia's house where Silvia was babysitting T.C., and Silvia confronted Petitioner with the picture.  *Id*. at 562-64.  Petitioner denied having an

---

[4] The Facts are taken from the pleadings, motion papers, and records from Petitioner's trial and subsequent appeals, filed in this proceeding.

[5] The court refers to the minor child by his initials.  Although T.C. was born during Petitioner's marriage to Adam, the child's paternity is disputed.

[6] References to "Trial Tr." are to pages of the transcript of the trial, filed as Dkt. 13-5.

[7] References to "Interview Tr." are to pages of the transcript of a videotaped interview of Petitioner by Ontario County Sheriff investigators on December 13, 2012, filed as Dkt. 13-6.  A video of the entire interview, which exceeded two hours, was played for the jury who were also provided with transcripts of the interview to assist with discerning what was said.  Trial Tr. at 1577-80.

affair and told Silvia Broadhurst was gay, but asked Silvia not to share the picture with Adam.  *Id*. at 562-66.  Silvia forwarded the picture to Adam.  *Id*. at 587.

On the morning on June 14, 2012, after dropping off T.C. at the home of a babysitter, Sandra Armison ("Armison"), Petitioner returned home to speak with Adam who had called in sick to work so as to have a discussion with Petitioner about the picture.  Interview Tr. at 4-5; Trial Tr. at 899.  Adam was angry with Petitioner who told Adam she only kissed Broadhurst.  Interview Tr. at 5.  Adam told Petitioner he intended to have a paternity test conducted to determine whether T.C. was his child, but Petitioner told Adam not to bother because she knew T.C. was not Petitioner's son.  *Id*. at 5, 10.  Adam responded by punching a hole in the wall.  *Id*.  During the argument, Petitioner and Adam were on the second floor of the house, standing near the top of a staircase.  *Id*.  Adam shoved Petitioner, who shoved Adam back, and Adam fell down the staircase, *id*. at 5-6, 11, which was a flight of 12 stairs.  *Id*. at 12.  Adam hit his head on a partially opened door at the bottom of the stairs, after which Adam did not move.  *Id*.  Petitioner, who did not call for help, checked Adam's wrist for a pulse but there was none, and after about five minutes Petitioner noticed Adam had urinated on himself, causing Petitioner to question whether he was dead.  *Id*. at 7-9, 38-39.  Petitioner struggled to move Adam who was significantly larger than Petitioner, and she retrieved a tarp-like piece of plastic which she slid under Adam's body which allowed Petitioner to drag it to the top of the stairwell leading to the basement, from which Petitioner had removed all items to make a clear path, and shoved Adam down those stairs causing Adam to strike his head on the concrete at the bottom of the stairs, after which

Petitioner was convinced Adam was dead.[8]  *Id*. at 39-40, 70.  Petitioner then left Adam's body at the bottom of the basement stairs while she ran some errands.  *Id*. at 41.

Later that same day, Petitioner went to Silvia's house to pick up T.C., and told Silvia that she and Adam had quarreled, Adam punched a hole in the wall and then walked out of the house, leaving his car and cell phone behind, and had not returned. Interview Tr. at 42; Trial Tr. at 566-67.  The next day, Petitioner got T.C. on the school bus, then went to the bank.  Interview Tr. at 13.  While Petitioner was at the bank, she received a call from Silvia who told Petitioner that Silvia informed the sheriff that Adam was missing and the sheriff wanted to speak with Petitioner.  *Id*.  Petitioner returned home and saw Adam's body still at the bottom of the basement stairs and realized she would be "arrested right on the spot" if the sheriff saw the body.  *Id*.  Petitioner then moved Adam's body to a dark corner of the basement where she covered the body with a plastic "kiddie pool" on top of which Petitioner placed boards so that the pile resembled a table, and surrounded the area with "stuff" piled on skids.  Interview Tr. at 13-14.  Petitioner then attended T.C.'s graduation from pre-school.  *Id*.

Petitioner and T.C. had dinner at Silvia's house several times in the days following Adam's death.  Trial Tr. at 569-70.  On the evening of June 18, 2012, Silvia asked Petitioner to bring her Adam's cell phone and Petitioner agreed.  *Id*. at 570-71. Petitioner returned about 15 minutes later and informed Silvia that Adam must have returned to the marital home because his cell phone and laptop computer were missing, and there was a note on the refrigerator stating, "We need to talk."  *Id*. at 571.  On June 18, 2012, Petitioner's co-worker, one Kenneth Call ("Call"), at Petitioner's request, typed and printed a sign stating "We need to talk."  *Id*. at 752-76.  Earlier that day, Sheriff

---

[8] It is undisputed that Adam's death was caused by either the first or second fall down the stairs.

Deputy Peck ("Peck"), was assisted by one Robert Brody ("Brody"), a civilian who had search and rescue dogs, in searching nearby trails and wooded areas for Adam without any success. *Id*. at 659-72; 698-700. Later that same day, Lee Martin ("Martin"), an investigator with the Ontario County Sheriff's Department, was assigned to Adam's missing person investigation. *Id*. at 1517. Martin, Brody, and Peck all went to Petitioner's house with a search dog and were reluctantly let in by Petitioner who maintained she had washed all of Adam's clothing so there was nothing in the house that carried Adam's scent for the search dog to use. *Id*. at 672, 692, 701, 713-14, 1525-26, 1613. Petitioner also said the basement was flooded, with several non-working lights, and dead rodents, but did allow it to be searched. *Id*. at 1539-41. Martin described Petitioner as "nervous" and "visibly shaking." *Id*. at 1540. Although Martin did observe several dead mice in the basement, the search dog did not "hit on" or "alert" as to anything, but the dog was trained for outdoor searches. *Id*. at 672-74, 693, 702, 1541, 1609.

On June 19, 2012, Petitioner used Adam's cell phone to send identical text messages to her mother-in-law and father-in-law advising that Adam was "okay, staying with a friend in Canandaigua and need time to think." Interview Tr. at 15-16; Trial Tr. at 574-76. Petitioner also sent a text message from Adam's cell phone to Petitioner's cell phone telling Petitioner she had to choose between Broadhurst and Adam. Interview Tr. at 16; Trial Tr. at 1551, 1624. Over the next couple of weeks, Ontario County Sheriff's Department investigators Martin and Christopher M. Drake ("Drake"), continued searching for Adam and Adam's family commenced holding rallies with 20-30 people outside Petitioner's house to draw attention to the fact that Adam remained missing, and

also set up a Facebook page and posted missing person notices.  Trial Tr. at 577-80, 587-88.  Petitioner then had a "falling out" with the rest of the Chase family and asked Armison to begin watching T.C. on weekdays from 5:00 A.M. to 5:15 P.M., and Armison agreed to do so except for Tuesdays on which days Armison did not work.  Interview Tr. at 53; Trial Tr. at 908-11.

Some six to eight weeks later, Petitioner left work early on a Monday to move Adam's body into her vehicle while T.C. was at the babysitter's house.  Interview Tr. at 52-53.  By then, Adam's body had decomposed to the point that it "just fell apart," *id*. at 3, and Petitioner, who was unable to move the intact body shortly after Adam fell down the stairs, was able to place the torso, limbs, and head in three separate plastic garbage bags.  *Id*. at 53-55.  Because the garbage bags were clear, Petitioner wrapped each bag in a blanket so the contents were not visible.  *Id*. at 54-55.  Petitioner then picked up T.C. from Armison's house, and drove to her mother's house on Haggerty Road, in the Town of Potter, located in Yates County, New York, where Petitioner hid the body in the woods behind her mother's house.  Interview Tr. at 56; Trial Tr. at 1099.  Petitioner's mother was not home at the time and Petitioner and T.C. spent the night at her mother's house. Interview Tr. at 52-53.  Petitioner took off work the following day.  *Id*.  Petitioner returned to her home where she demolished a wooden ramp in the back of the house for firewood. *Id*. at 56.

Several day later, Petitioner, accompanied by T.C. and Broadhurst, returned to her mother's house where they intended to have a bonfire.  Interview Tr. at 56-57; Trial Tr. at 881-83.  Unbeknownst to T.C. and Broadhurst was that underneath a large pile of wood for the bonfire was Adam's body, which Petitioner had doused with

10

Jaegermeister, Adam's favorite alcohol. Interview Tr. at 82. In the basement of Petitioner's mother's house was a dead cat which Petitioner asked Broadhurst to retrieve and place on top of the bonfire to disguise any suspicious smells that might emanate from the bonfire. Interview Tr. at 57; Trial Tr. at 883. The bonfire burned for about five hours, and Petitioner occasionally stirred the fire as it burned down to make sure Adam's bones were not observed by Broadhurst. Interview Tr. at 62-63. The following day, Petitioner returned to her mother's home and shoveled the ashes from the bonfire into a trash can, being careful to secrete the bones in the bottom of the trash can underneath the ashes, telling her mother she wanted to make sure there were no nails from the burned boards on the lawn that might be hit by a lawnmower. *Id*. at 63.

Meanwhile, the search for Adam both by his family and Sheriff investigators continued. On August 10, 2012, Ontario County Sheriff's Department Investigator William Wellman ("Wellman"), responded to Petitioner's house in front of which Chase family members and friends were protesting, carrying signs requesting the Sheriff to search the house. Trial Tr. 640-47. Petitioner invited Wellman to search the house which Wellman did including the basement where Wellman noticed a "little odor" and some dead bats. *Id*. Petitioner also offered Wellman the opportunity to search two computers and an X-Box computer gaming system all of which were subsequently retrieved from the house by James Alexander ("Alexander"), a sergeant with the Ontario County Sheriff's Office police. *Id*. at 1327, 1344. A computer forensic examination was conducted on the computers by Ontario County Sheriff's Office police officer Paul Hagen ("Hagen"), who discovered that on one of the computers, searches had been done using such terms as "Social Security widow benefits," "locating life insurance

policies deceased," "what assets is [*sic*] transferred to spouse after death in NY," and "finding assets after death." *Id*. at 1435-41.

On November 14, 2012, Petitioner picked up T.C. from Armison's house and was "ecstatic" because earlier that day she appeared at a televised press conference where she learned that Adam's case was still considered a missing person's case. Trial Tr. at 914-15. On November 16, 2012, Armison observed Petitioner was "extremely agitated" and "upset" and told Armison that several Chase family members appeared on a local radio program and reported they believed Petitioner murdered Adam. *Id*. at 916-18. After speaking with the Deputy Sheriff Brad Falkey, Petitioner felt better. *Id*. at 614-28.

On December 13, 2012, one Rodney Miller ("Miller"), who was a friend of the Chase family and a private investigator who had separately been investigating Adam's disappearance, approached Armison and requested her assistance with a plan designed to elicit from Petitioner a confession to killing Adam. Trial Tr. at 919-20, 934, 936-37, 960. When Petitioner picked up T.C. from Armison, Armison told Petitioner Armison heard there was a break in Adam's missing person's case and the Sheriff's Department no longer believed Adam was missing. *Id*. at 921. Petitioner responded to the news by turning "white as a ghost," trembling, and repeatedly stating, "Oh my God, Shit." *Id*. at 921-22. Petitioner quickly left and Armison called Miller and reported Petitioner's reaction to the news. *Id*. at 922.

Miller then drove to Petitioner's house where Petitioner stood on the front porch, and falsely informed Petitioner that Miller had enough evidence to charge Petitioner with the murder of Adam. Trial Tr. at 962-64. Petitioner responded by trembling, putting her head in her hands, and rocking back and forth. *Id*. at 964. Miller continued telling

Petitioner "it was time to give him up," and that he knew Adam's body had been in the basement of the house, and Miller demanded to know where Petitioner buried the body. *Id*. at 964-65.  Petitioner then told Miller she did not bury the body but burned it and hid the bones.  *Id*. at 965.  After hearing Petitioner's confession, Miller telephoned Silvia, then the Sheriff's Department, and followed Petitioner into the house where Petitioner retrieved her coat, told Broadhurst who was sitting on a sofa in the living room she killed Adam, spoke a few words to T.C., walked back outside and sat on the front porch.  *Id*. at 965-71.  Within a few minutes, Silvia and some other Chase family members and friends, arrived and exchanged words with Petitioner, at which point Miller told Petitioner to sit in the back seat of his vehicle.  *Id*. at 971.  Eventually, Ontario County Sheriff Road Patrol Deputy Rebecca Edington ("Edington"), and Investigator John Falbo ("Falbo") arrived at Petitioner's house.  AR at 1094-99, 1456-60, 1486.  In response to questions posed by Falbo, Petitioner stated Adam accidentally fell down the stairs and died, after which Petitioner hid the body for weeks in the basement before transporting the body to woods behind her mother's house and then burned it.  *Id*. at 1460-61, 1487.  Petitioner agreed to accompany Edington and Falbo to her mother's house on Haggerty Road in Potter.[9]  *Id*. at 1099-1101, 1461-62.  Petitioner's mother met them at the road and consented to a search of her property.  *Id*. at 1103-05, 1464-67.  While walking toward the area where the bonfire had burned, Petitioner pointed to the trash can into which she had shoveled Adam's remains, the officers observed ashes, and bone fragments inside the can, and Petitioner stated the larger bones were near the bottom of the can.  *Id*. at 1107-10, 1147, 1469-70, 1495-96.  When Petitioner's mother asked

---

[9] It is undisputed that while en route to Petitioner's mother's house, Falbo advised Petitioner of her rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966).  Trial Tr. at 1462.

whether the bones were deer bones, Petitioner responded that if so, she would not be confessing. *Id*. at 1111, 1470. Petitioner also identified the burn pit as the place where Adam was cremated, advising some of Adam's vertebrae might be inside some nearby bags. *Id*. at 1108-10, 1471, 1479. Falbo then drove Petitioner to the Sheriff's office where Petitioner submitted to a video-taped interviewed by Falbo and Martin lasting more than two hours. *Id*. at 1476-79, 1557-60. *See* Interview Tr., *passim*.

During the interview, although Petitioner initially maintained she accidentally caused Adam to fall down the stairs, she later stated that "subconsciously, I did want to push him," Interview Tr. at 37, and that after Adam began falling, Petitioner gave Adam a "final shove" because she was angry with him. *Id*. at 38. After Adam tumbled down the stairs, he did not move and Petitioner checked Adam's wrist for a pulse but there was none. *Id*. at 7, 38-39. Petitioner did not call for help, but after about five minutes she noticed Adam had urinated on himself, causing Petitioner to question whether he was dead, *id*. at 7-9, 38-39, but to be sure, Petitioner shoved Adam down the stairs from the first floor to the basement, after which Petitioner was convinced Adam was dead. *Id*. at 39-40, 70. Petitioner admitted she did not call 911 because she did not want Adam to survive the fall and make things difficult for Petitioner by seeking a paternity test with regard to T.C. *Id*. at 72. Petitioner explained that she failed to come forward with the truth about Adams death and engaged in deceptive conduct to hide the truth because she was afraid people would suspect Petitioner murdered Adam. *Id*. at 16, 60. Petitioner admitted to having several affairs, *id*. at 21-22, that Adam was not the father of her son, *id*. at 19-20, and that she believed her life would be easier without Adam but did not divorce Adam both she feared the impact on her finances, *id*. at 78-80, 82, that

Adam would seek to verify whether he was T.C.'s father, and upon discovering he was not, T.C.'s relationship with Adam's parents, who were "great grandparents," would cease. *Id*. at 19-20. Petitioner blankly stated that she burned Adam's body because Petitioner believed "if it was found, chances are [Petitioner] would be nailed for murder." *Id*. at 60.

## DISCUSSION

### 1. Habeas Review Standard

With Petitioner's withdrawal of her unexhausted grounds, two ground for habeas relief remain including (1) the Appellate Division erred in finding the conviction on the second degree murder charge was not contrary to the weight of the evidence, Petition, First Ground; and (2) the prosecution violated New York's so-called *Rosario* rule requiring, pursuant to *People v. Rosario*, 173 N.E.2d 881 (N.Y. 1961), the prosecution's disclosure of all witness statements, written or recorded, made by any witness the prosecution intends to call at trial. *Id.*, Second Ground. Respondent argues in opposition to habeas relief that Petitioner cannot meet her burden to establish the verdict on the second degree murder charge was against the weight of the evidence, Respondent's Memorandum at 19-22, and a *Rosario* violation, even if established, is not a recognized ground for federal habeas relief. *Id*. at 22-23. Petitioner has not replied in further support of her petition.

In reviewing habeas petitions, a federal court is not permitted to act as an appellate court to review matters within the jurisdiction of the state courts, or review specific rulings and decisions of state trial and appellate courts not involving federal

constitutional claims; rather, the court is to determine whether the proceedings in the state court, as challenged by a habeas petition, amount to a violation of the Petitioner's federal constitutional rights as declared by the Supreme Court.  28 U.S.C. § 2254(d)(1); *Coleman v. Thompson,* 501 U.S. 722, 730 (1991) ("When a federal district court reviews a state prisoner's habeas corpus petition pursuant to 28 U.S.C. § 2254, it must decide whether the petitioner is 'in custody in violation of the Constitution or laws or treaties of the United States'") (quoting 28 U.S.C. § 2254(a)), *reh'g denied,* 501 U.S. 1277 (1991), *holding modified by Martinez v. Ryan*, 566 U.S. 1 (2012).  Accordingly, federal review of state court convictions is limited to errors of such federal constitutional magnitude they necessarily deny the criminal defendant the right to a fundamentally fair trial.  *Cupp v. Naughton,* 414 U.S. 141, 147 (1973).

Pursuant to § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court must give substantial deference to a state court determination that has "adjudicated [the federal constitutional claim] on the merits."  28 U.S.C. § 2254(d); *Sellan v. Kuhlman,* 261 F.3d 303, 309–10 (2d Cir. 2001). The AEDPA requires that where a state court has adjudicated the merits of a petitioner's federal claim, habeas corpus relief may not be granted unless the state court's adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d) ("§ 2254(d)").  Under *Williams v. Taylor,* 529 U.S. 362, 364 (2000), a federal habeas court may grant relief if the state court arrives at a

conclusion opposite to that reached by the Supreme Court on a question of law, or decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Id.* This AEDPA requirement for habeas relief applies to petitions filed on or after the statute's April 24, 1996 effective date, *see, e.g., Williams,* 529 U.S. at 402; *Lindh v. Murphy,* 521 U.S. 320, 336 (1997); *Smith v. McGinnis,* 208 F.3d 13, 15 (2d Cir. 2000) (*per curiam*), *cert. denied,* 531 U.S. 840 (2000), and thus applies to the Petition. State court decisions involve unreasonable application of Supreme Court caselaw where such decisions "identif[y] the correct governing legal principle from [the Supreme Court's] decisions but unreasonably appl[y] that principle to the facts of [a] prisoner's case." *Id.* A federal habeas court must therefore apply the § 2254(d) deferential review standard where the state court has "adjudicated [the federal claim] on the merits," 28 U.S.C. § 2254(d), and, in instances where claims have not been adjudicated on the merits, apply the pre-AEDPA *de novo* review standard, even where the petition was filed after the effective date of the statute. *Sellan,* 261 F.3d at 314; *Boyette v. Lefevre,* 246 F.3d 76, 89, 91 (2d Cir. 2001).

Pursuant to 28 U.S.C. § 2254(e) ("§ 2254(e)"), formerly 28 U.S.C. § 2254(d), the state court's determination as to evidentiary matters is presumed correct, unless the federal habeas court concludes that the relevant state court determination is not fairly supported by the record, *Sumner v. Mata,* 449 U.S. 539, 546–47 (1981), and it is the burden of the petitioner to establish, by clear and convincing evidence, that the court's factual determination is erroneous. 28 U.S.C. § 2254(e)(1). Section 2254(e), applies by its terms, "to factual determinations made by state courts, whether the court be a trial court or an appellate court." *Sumner,* 449 U.S. at 547.

Here, with regard to the Petition, the court is in possession of the complete State Court Record, including transcripts of the *Huntley* hearing, trial and Petitioner's videotaped interview, and briefs filed in connection with Petitioner's direct appeal to the Appellate Division and the Court of Appeals.  Petitioner has not requested that the court conduct an evidentiary hearing prior to resolving her claims alleged in the Petition and does not otherwise challenge the record as inaccurate.  Accordingly, the court finds an evidentiary hearing unnecessary.

**2.    Merits of Petitioner's Grounds**

**A.    Sufficiency of the Evidence**

As her First Ground, Petitioner argues the Appellate Division erroneously found her conviction of second degree murder was not against the weight of the evidence because all of the evidence against Petitioner was circumstantial and the prosecution failed to establish causation.  Petition, First Ground.  In opposing this ground, Respondent argues the claim is not cognizable on federal habeas review, Respondent's Memorandum at 17-19, and, alternatively, the claim is meritless insofar as it can be construed as challenging as legally insufficient the trial evidence for second degree murder. *Id.* at 19-22.

As Respondent argues, Respondent's Memorandum at 17-19, the question of the weight of the evidence is a question of state law, which precludes a federal habeas court from its review.  *McKinnon v. Superintendent, Great Meadows Corr. Facility,* 422 Fed. Appx. 69, 75 (2d Cir. 2011) ("[T]he argument that a verdict is against the weight of the evidence states a claim under state law, which is not cognizable on habeas corpus...." (citing cases including, *inter alia, Estelle v. McGuire,* 502 U.S. 62, 67–68

(1991) ("federal habeas corpus relief does not lie for errors of state law.") (internal

quotation omitted))).  Petitioner's First Ground should thus be DISMISSED for failing to

assert a claim cognizable on federal habeas review.

Alternatively, as Respondent argues, Respondent's Memorandum at 19-22, the

claim lacks merit.  "The standard for assessing the sufficiency of the evidence to

support a guilty verdict is well settled, and it is the same under both Federal and New

York state law: The reviewing court is limited to asking whether 'after viewing the

evidence in the light most favorable to the prosecution, *any* rational trier of fact could

have found the essential elements of the crime beyond a reasonable doubt.'" *Klosin v.*

*Conway*, 501 F. Supp. 2d 429, 440 (W.D.N.Y. 2007) (quoting *Jackson v. Virginia*, 443

U.S. 307, 318-19 (1979) (italics in original)).  In making this evaluation, "this [c]ourt must

defer to the jury's assessment of credibility."  *Cruz v. Giambruno*, 2009 WL 2928956, *4

(W.D.N.Y. 2009).  Further, a habeas petitioner "bears a very heavy burden in convincing

a federal *habeas* court to grant a petition on the grounds of insufficiency of the

evidence."  *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000) (italics in

original).

In considering the sufficiency of the evidence supporting a state conviction, "[a]

federal court must look to state law to determine the elements of the crime."  *Quartararo*

*v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999) (footnote omitted).  Pursuant to New York

Penal Law § 125.25[1], "[a] person is guilty of murder in the second degree when ...

[w]ith intent to cause the death of another person, he causes the death of such person .

. . ."  Although not clearly articulated, a broad construction of the Petition, as required in

light of Petitioner's *pro se* status, *Haines v. Kerner*, 404 U.S. 519, 520 (1972)

(articulating that pleadings of *pro se* litigant are held "to less stringent standards than formal pleadings drafted by lawyers"), reveals Petitioner is arguing the evidence at trial does not support the requisite intent to cause death for the second degree murder conviction.[10]  This ground is without merit.

"The mens rea for any crime ''can be formed, and need only exist, *at the very moment* the person engages in prohibited conduct or acts to cause the prohibited result, and not at any earlier time'''  *People v. Brown*, 999 N.E.2d 1168, 1174 (N.Y. 2013) (quoting *People v. Muhammad,* 959 N.E.2d 463, 534 (N.Y. 2011) (emphasis added in *Brown)* (quoting New York Criminal Jury Instructions 2d, Culpable Mental States—Intent)).  "With respect to the crime of murder in the second degree of which defendant was convicted, '[a]lthough a finding that defendant did not intend to kill the victim[ ] would not have been unreasonable . . ., it cannot be said that County Court, which saw and heard the witnesses and thus was able to assess their credibility and reliability in a manner that is far superior to that of reviewing judges who must rely on the printed record, failed to give the evidence the weight it should be accorded'"  *People v. Badger,* 935 N.Y.S.2d 416, 417 (4th Dept. 2011) (quoting *People v. Simcoe,* 904 N.Y.S.2d 622, 623 (4th Dept.), *lv. denied*, 939 N.E.2d 817 (N.Y. 2010)), *lv. denied*, 968 N.E.2d 1002 (N.Y. 2012)).  The federal court defers to the jury's assessments as to witness credibility and the weight of the evidence.  *Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996) (citing cases).  The sufficiency-of-evidence "inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a

---

[10] Intent to cause death is not an element of either of the lesser included offenses of manslaughter in the first degree and manslaughter in the second degree, on which the jury was also instructed.  Trial Tr. at 1807-09.  *See* N,Y. Penal Law § 125.20 (manslaughter in the first degree requiring intent to injure but resulting in death); § 125.15 (manslaughter in the second degree requiring death caused by the defendant's recklessness).

*rational* decision to convict or acquit." *Herrera v. Collins,* 506 U.S. 390, 402 (1993) (emphases in original). Intent sufficient to support second degree murder may be inferred from "'the circumstances surrounding the crime'" including the defendant's conduct both before and after the death. *People v. Chase*, 71 N.Y.S.3d 293, 295 (4th Dept. 2018) (quoting *Badger,* 935 N.Y.S.2d at 417). Here, the jury could rationally infer Petitioner's intent to kill Adam from the circumstances surrounding Adam's death including Petitioner's own statements and Petitioner's conduct both before and after Adam's death.

In particular, when interviewed by Investigators Martin and Falbo, Petitioner stated that she shoved Adam causing him to catch his foot and fall down the stairs, Interview Tr. at 11, hitting his head on a partially opened door at the bottom of the stairs, after which Adam did not move. *Id*. at 12. Although Petitioner initially maintained she accidentally caused Adam to fall down the stairs, she later stated that "subconsciously, I did want to push him," *id*. at 37, and that after Adam began falling, Petitioner gave Adam a "final shove" because she was angry with him and wanted Adam to fall down the stairs. *Id*. at 37-38. After Adam tumbled down the stairs, he did not move and Petitioner checked Adam's wrist for a pulse but there was none. *Id*. at 7, 38-39. Petitioner did not call for help, but after about five minutes she noticed Adam had urinated on himself, causing Petitioner to question whether he was dead, *id*. at 7-9, 38-39, and to be sure Adam was dead, Petitioner dragged Adam's body to the top of the stairwell leading to the basement, removed all items from the stairwell to make a clear path, and shoved Adam down those stairs causing Adam to strike his head on the concrete at the bottom of the stairs, after which Petitioner was convinced Adam was

dead. *Id*. at 39-40, 70. Petitioner admitted she did not want Adam to survive the fall and that is why she did not call 911. *Id*. at 72. Petitioner explained that she hid Adam's body, burned the remains, and made up the story about Adam walking out of the house with his cell phone and computer because she was afraid people would suspect Petitioner murdered Adam. *Id*. at 16, 60. Petitioner admitted that she had several affairs during her marriage to Adam, *id*. at 21-22, that Adam was not the father of her son, *id*. at 19-20, and that she had envisioned herself and her son would be better off without Adam in their lives but was hesitant to divorce Adam both because she feared Adam would take half the marital assets including the half of the money in Petitioner's 401k account. *Id*. at 78-80, 82. Petitioner also stated that she feared Adam would seek to verify whether he was the father of Petitioner's son and upon discovering Adam was not T.C.'s father, Adam's parents, who were "great grandparents," would cut off contact with the child. *Id*. at 19-20. Petitioner's conduct in concealing Adam's body is consistent with her statements that she feared people would think she murdered Adam, Interview Tr. at 16, and that if she burned the body because Petitioner believed "if it was found, chances are [Petitioner] would be nailed for murder." *Id*. at 60.

The circumstances surrounding Adam's death constituted sufficient evidence for the jury to rationally decide to convict Petitioner of second degree murder. *Herrera,* 506 U.S. at 402. Specifically, the circumstances include Petitioner's statements that she was involved in several extra-marital affairs and Adam was not T.C.'s father, that Petitioner believed she and T.C. would be better off with Adam no longer in their lives, but financial considerations prevented Petitioner from divorcing Adam, and that as Adam was falling, she gave him a "final shove," Trial Tr. at 38, as well as that although

Petitioner was not sure Adam was dead after the initial fall, she failed to seek emergency medical care and instead shoved him down the stairwell leading to the basement after which Petitioner was sure Adam was dead.  Petitioner also explained she tried to hide Adam's death by fabricating the story of Adam leaving the house on foot and without his cell phone, and then disposing of Adam's decomposed body by burning it because Petitioner feared she would be "nailed for murder."  Interview Tr. at 60.   Based on these circumstances, a jury could rationally decide that while giving Adam a "final shove" down the staircase, and then failing to seek emergency medical care for Adam, Petitioner, at the moment of both the first and second shove, intended that Adam not survive the fall.  *See cf. People v. Stevens*, 811 N.Y.S.2d 84, 85 (2d Dept.) (holding evidence at trial that defendant obtained entry into home by posing as handyman offering to make repairs and once inside, pushed the homeowner down the stairs then proceeded to search through the house for money supported second degree murder conviction), *lv. denied*, 849 N.E.2d 982 (N.Y. 2006).  Further, Petitioner points to no case with a similar factual background where the evidence was insufficient to support an intent to cause death, nor was any such case referenced in support of Petitioner's direct appeal, *see* State Court Record (Dkt. 13-2) at 37-38, and the court's research has revealed none.  Although a finding of intent to cause death supporting second degree murder was close, that the jury was alternatively instructed on the lesser included offenses of manslaughter in the first and second degree, neither of which requires a *mens rea* of intent to cause death, yet convicted Petitioner of second degree murder, demonstrates the jury found the evidence supported that Petitioner intended to

kill Adam.  The court therefore finds the evidence was sufficient to support the jury's conviction of second degree murder.

In short, Petitioner has failed to meet her "very heavy burden" of establishing the evidence adduced at trial was insufficient to support Petitioner's conviction of second degree murder.  *Fama*, 235 F.3d at 811.  The Appellate Division's decision on the merits of this claim was thus neither contrary to, nor an unreasonable application of, federal law, nor was it unreasonable in light of the evidence presented to the trial court. Accordingly, Petitioner's First Ground challenging the sufficiency of the evidence to support the second degree murder conviction should be DISMISSED on its merits.

**B.** *Rosario*

Petitioner's Second Ground alleges the prosecution violated New York's so-called "*Rosario* rule" requiring, pursuant to *People v. Rosario*, 173 N.E.2d 881 (N.Y. 1961), disclosure of witness statements in criminal cases.  The Second Circuit has held that a claim for federal habeas relief based on a *Rosario* violation fails because federal habeas relief may be granted only to remedy a violation of federal law, whereas "the obligation to turn over *Rosario* material arises under *state* law."  *Landy v. Costello*, 141 F.3d 1151, 1151 (2d Cir. 1998) (dismissing habeas petition to the extent it was based on an alleged violation of *Rosario*) (italics in original).  *See also Miles v. Conway*, 739 F. Supp. 2d 324, 340 (W.D.N.Y. 2010) ("Federal habeas courts have consistently held that Rosario claims are not subject to review because they arise exclusively under state law." (citing *Pena v. Fischer,* 2003 WL 1990331 at *10 (S.D.N.Y. Apr. 30, 2003); *Johnson v. Filion,* 232 F.Supp.2d 98, 100 (S.D.N.Y.2002); and *Green v. Artuz,* 990

F.Supp. 267, 274 (S.D.N.Y.1998)).  Accordingly, even if there was a violation of the *Rosario* rule, such violation provides no basis for federal habeas relief.

The Petition thus should be DISMISSED in its entirety. Furthermore, as the court finds there is no substantial question presented for appellate review, a certificate of appealability should not issue. 28 U.S.C. § 2253, as amended by the AEDPA.

## <u>CONCLUSION</u>

Based on the foregoing, the Petition should be DISMISSED.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:    February 28th, 2023
Buffalo, New York

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

<u>**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**</u>

*Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited*, 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Petitioner and the Respondent.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      February 28th, 2023
            Buffalo, New York